**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON BUTLER, et al.,

    *Plaintiffs*,

  v.

ENTERPRISE INTEGRATION
CORPORATION, et al.,

    *Defendants*.

Civil Action No. 1:19-cv-01074 (CJN)

## MEMORANDUM OPINION

Plaintiffs Jason Butler and Thomas Price assert that they are the rightful owners of

Defendant Enterprise Integration Corporation ("EIC").  *See generally* 3d Am. Compl., ECF No.

28.  Defendant Walter Augustine claims the company for himself.  *See generally* Defs.' Mem. in

Support of Mot. to Dismiss for Failure to State Claims ("Mot."), ECF No. 29-1.  Butler and Price

filed this lawsuit, alleging a breach of contract, several quasi-contract alternative claims, and

other torts arising out of their falling-out with Augustine.  *See generally* 3d Am. Compl.  Before

the Court are Defendants' Motion to Dismiss, ECF No. 29, and Plaintiffs' Motion to Disqualify

Defendants' Counsel, ECF No. 39.  The Court dismisses some counts in the Complaint, leaves

others in place, and declines to disqualify defense counsel at this stage of the litigation.

## I.  Background

In 2011, Walter Augustine was the sole owner of EIC, a small government contracting

firm incorporated in Louisiana and headquartered in the District of Columbia.  3d Am. Compl.

¶¶ 4, 7–9.[1]  According to the operative Complaint, Butler reached out to Augustine that year to convey Butler's interest in purchasing the company.  *Id.* ¶ 10.  The two worked out a tentative deal:  if Butler would use his high-level security clearance to obtain new business for EIC, Augustine would credit revenue from the new contracts toward an ownership stake in the company for Butler.  *Id.* ¶¶ 1, 13.  Butler was to join as a minority partner and to create a new division of EIC, entitled the "Business Unit."  *Id.* ¶ 14.  As the Business Unit generated profits, Butler's share of equity in the company would progressively increase.  *Id.*  Once that figure surpassed $600,000 (Augustine's rough valuation of the entire company), Butler would own the company outright, though the two envisioned Augustine remaining on as a senior consultant following completion of the sale.  *Id.* ¶¶ 10–11, 14, 18.  Augustine provided Butler with a spreadsheet laying out potential scenarios and timelines in which to accomplish the ownership transfer.  *Id.* ¶ 15.

The following year, Butler brought Jason Price onboard, and in 2014, Butler and Augustine agreed to include Price as a partner.  *Id.* ¶ 16.  Butler and Price agreed to cap Price's equity, such that they would eventually achieve an 80/20 split between them, respectively.  *Id.* ¶¶ 16, 17.  That same year, Butler and Price left their other ventures and began to work for EIC full-time.  *Id.* ¶ 20.  Using their security clearances, Butler and Price obtained a "Top Secret Facilities" designation for EIC, enabling the company to bid on a class of government contracts previously unavailable to it because Augustine had no clearance of his own.  *Id.* ¶¶ 21, 24.

The Business Unit obtained several profitable contracts—at a time when EIC had no other business.  *Id.* ¶¶ 25–26.  While Butler and Price handled the company's performance of

---

[1] On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must, of course, accept well pleaded facts in the Complaint as true.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

those contracts, Augustine managed the books. *Id.* ¶ 27. As part of the company's bids on government contracts, EIC had to submit forms listing the company's ownership, such as Key Management Position Lists ("KMPL"). *Id.* ¶ 32. Augustine prepared and signed the documents; the ones he submitted in 2015 listed three partners and their respective stakes: Augustine (60%), Butler (20%), and Price (20%). *Id.* ¶ 33.

But whenever Butler and Price requested to inspect the company's financial records, either to assess the company's health or to measure their accrual of equity, Augustine provided only incomplete records and otherwise avoided or deflected their inquiries. *Id.* ¶ 28. Neither Butler nor Price was compensated for his efforts from 2014–2016; all revenues from their contracts went to EIC—and thereby into Augustine's pocket as Butler and Price slowly bought him out. *Id.* ¶ 30. In 2017 they received limited compensation to cover living expenses, but they did not receive the full value of the Business Unit's revenue that year. *Id.*

Things began to fall apart in 2017. *Id.* ¶¶ 36–41. After disputes arose between Augustine and Butler about the terms of the buyout, Butler contacted EIC's outside counsel, William Cusmano. *Id.* ¶ 36. Butler had first engaged Cusmano on EIC's behalf in 2014, and Cusmano continued to represent EIC on various legal matters over the ensuing years. *See* Butler Decl. ¶¶ 2–4, ECF No. 39-3. Cusmano was the only attorney Butler knew, so Butler approached Cusmano for advice about how to deal with Augustine. *Id.* ¶ 9. Cusmano heard Butler out and recommended that, if Augustine denied Butler's partial ownership, Butler should consider retaining counsel and pursuing legal remedies. *Id.* ¶ 11.

Cusmano pulled Augustine, Butler, and Price into a discussion about how to complete Augustine's sale of the company to Butler and Price. *See* Cusmano's Email of Sep. 6, 2017, ECF No. 39-4 at 2–3. The four traded emails back and forth over the next ten days, with

Cusmano offering to structure various purchase agreements that would satisfy all Parties.  *See*

*generally* Email Correspondence, ECF Nos. 39-4, 39-5.  Those negotiations collapsed, and

Augustine terminated Butler's and Price's employment on September 15, 2017.  *See* Butler's

Email of Sep. 13, 2017, ECF No. 39-5 at 1 ("I'm out."); 3d Am. Compl. ¶ 38.  Augustine denied

both the existence of any purchase agreement and that either Butler or Price had accrued any

ownership stake in EIC.  *Id.* ¶ 39.

Augustine then shut down Butler and Price's access to their documents, contact lists, and

email accounts stored on EIC's computer systems.  *Id.* ¶¶ 50–51.  Augustine continued to access

Butler's email account and, on at least one occasion, read an email from one of Butler's business

contacts (intended for Butler) and responded to it (from Butler's account) without disclosing that

Butler no longer worked at the company.  *Id.* ¶¶ 52–59.

Finally, the Complaint alleges that Augustine was responsible for preparing and filing

EIC's tax returns.  *Id.* ¶ 42.  For tax years 2014–2016, however, Augustine failed to file any

corporate returns on EIC's behalf whatsoever.  *Id.*  For tax year 2017, Augustine filed IRS Form

1099s characterizing Butler and Price as independent contractors rather than partial owners.  *Id.*

¶ 45.

Butler and Price originally filed suit in the United States District Court for the Eastern

District of Louisiana.  *See generally* Compl., ECF No. 1.  Plaintiffs amended their Complaint

twice before that court transferred the case to this district.  *See generally* 1st Am. Compl., ECF

No. 14; 2d Am. Compl., ECF No. 17; Transfer Order, ECF No. 18.  Upon transfer, both Parties

obtained new counsel local to the Washington area.  Defendants EIC and Augustine retained

William Cusmano—the same attorney who had previously represented EIC in other legal matters

and who was at the heart of the failed negotiations among Butler, Price, and Augustine to settle

the matter without resorting to litigation.  *See, e.g.*, Def. Augustine's Answer to Pls.' 2d Am.

Compl., ECF No. 21 (filed by William Cusmano).

Defendants answered the Second Amended Complaint.  *Id.*  Plaintiffs then obtained leave

to file a Third Amended Complaint, which Defendants then moved to dismiss in its entirety for

failure to state a claim and as barred by the applicable statute of limitations.  *See generally* Mot.[2]

The operative Complaint contains nine counts, which fall into three broad categories of claims.

First, Plaintiffs bring four common-law counts alleging a breach of the contract and related fraud

or, in the alternative, some form of quasi-contractual claim:  (I) breach of contract, 3d Am.

Compl. ¶¶ 60–66; (II) fraudulent inducement, *id.* ¶¶ 67–73; (VI) promissory estoppel, *id.* ¶¶ 97–

102; and (VII) quantum meruit (unjust enrichment), *id.* ¶¶ 103–11.  Second, they lodge three

counts alleging related torts:  (III) defamation (invasion of privacy), *id.* ¶¶ 74–81; (IV) a

violation of the Stored Wire and Electronic Communications Act, 18 U.S.C. § 2707, 3d Am.

---

[2] Ordinarily, "[t]he filing of an amended complaint will not revive the right to present by motion defenses that were available but were not asserted in timely fashion prior to the amendment of the pleading," but "a . . . defense that becomes available because of new matter in the amended complaint may be asserted by motion."  5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1388 (3d ed. 2020); *see also Keefe v. Derounian*, 6 F.R.D. 11 (N.D. Ill. 1946) (denying motion to dismiss amended complaint, which contained no new factual allegations or legal argument but which merely corrected jurisdictional information, because the court had already denied defendant's motion to dismiss original complaint on the same grounds). That rule might serve to bar Defendants' current Motion to Dismiss, as they already answered the Second Amended Complaint—at the very least, it would constrain the pending Motion to challenging only new material in the Third Amended Complaint.  But Defendants' answers to the Second Amended Complaint were unusually styled as "Responsive Pleadings to Plaintiffs' Second Amended Complaint" and contained both short answers to the Complaint *and* brief, partially formed arguments to dismiss the Complaint for failure to state a claim.  *See, e.g.*, Def. Augustine's Responsive Pleadings to Pls.' 2nd Am. Compl., ECF No. 21.  Perhaps because neither the Complaint nor Defendants' responses were adequately pleaded, Judge Moss seems to have granted both Parties an opportunity to amend and refile their pleadings.  *See* Minute Entry of Jun. 6, 2019 (orally granting Plaintiffs leave to file 3d Am. Compl.).  And because Plaintiffs do not now argue that Defendants waived their opportunity to move to dismiss the Third Amended Complaint in its entirety by answering the Second Amended Complaint, the Court takes both operative filings at face value.

Compl. ¶¶ 82–87; and (V) fraudulent filing of tax returns, 26 U.S.C. § 7434, 3d Am. Compl.

¶¶ 88–96.  Finally, they assert two standalone counts seeking specific types of relief:  (VIII)

declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, 3d Am. Compl.

¶¶ 112–13; and (IX) an accounting of EIC's assets, *id.* ¶¶ 114–16.  Subject-matter jurisdiction is

premised on diversity, though the Complaint raises at least two federal questions on its face.  *Id.*

¶ 5.

      While the Motion to Dismiss was pending, Plaintiffs filed a Motion to Disqualify

Defense Counsel William Cusmano.  *See generally* Pls.' Mot. to Disqualify Defs.' Counsel, ECF

No. 39.  The Motion argues that Cusmano cannot now represent Defendants EIC and Augustine

because (1) Cusmano represented Butler individually against Augustine earlier in this same

dispute; (2) Cusmano previously represented all three alleged owners together in their capacities

as EIC shareholders, so he cannot now represent one of them (and the company) against the

other two; and (3) Cusmano is a necessary witness and therefore cannot represent any party in

this litigation.  *See generally* Pls.' Mem. in Support of Pls.' Mot. to Disqualify Defs.' Counsel

("DQ Mot."), ECF No. 39-1.

## II.     Legal Standard

### A.     Motion to Dismiss

      "A pleading that states a claim for relief must contain . . . a short and plain statement of

the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "When

evaluating a motion to dismiss [under Federal Rule of Civil Procedure 12(b)(6)], the Court must

treat the complaint's factual allegations as true and afford the plaintiff the benefit of all

inferences that can be derived from the facts alleged."  *Atlas Brew Works, LLC v. Barr*, 391 F.

Supp. 3d 6, 11 (D.D.C. 2019) (internal quotations and citations omitted).  Although the Court

accepts all well pleaded facts in the Complaint as true, "[f]actual allegations must be enough to

raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "While a complaint . . . does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 554–55 (internal quotations and citations omitted). The claim to relief must be "plausible on its face," enough to "nudge[ the] claims across the line from conceivable to plausible." *Id.* at 570.

The Court evaluates Counts II and V under a different standard because both include allegations of fraud, *see* 3d Am. Compl. ¶¶ 67–73, 88–96, and fraud claims are subject to more stringent review on a motion to dismiss. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ P. 9(b). "[T]he 'circumstances' that must be pleaded with specificity are matters such as the 'time, place, and contents of the false representations,' such representations being the element of fraud about which the rule is chiefly concerned.'" *U.S. ex rel Totten v. Bombadier Corp.*, 286 F.3d 542, 552 (D.C. Cir. 2002) (emphasis omitted) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1297 (2d ed. 1990)).

### B.      Motion to Disqualify

"The district court has wide discretion in the exercise of its duty to supervise members of the bar appearing before it." *Koller ex rel Koller v. Richardson-Merrell Inc.*, 737 F.2d 1038, 1054 (D.C. Cir. 1984), *vacated on other grounds*, 472 U.S. 424 (1985). But "[d]isqualification of an attorney is a serious step." *Derrickson v. Derrickson*, 541 A.2d 149, 152 n.6 (D.C. 1988). Lawyers practicing in this Court are subject to the District of Columbia Rules of Professional Conduct. LCvR 83.15(a). The primary situations warranting disqualification are "(1) where an attorney's conflict of interests . . . undermines the court's confidence in the vigor of the attorney's representation of his client, or . . . (2) where an attorney is at least potentially in a

position to use privileged information concerning the other side through prior representation, . . . thus giving his present client an unfair advantage." *Koller*, 737 F.2d at 1055 (quoting *Bd. of Educ. of N.Y. City v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979)).  "Unless an attorney's conduct tends to taint the underlying trial" as in one of those two categories, "courts should be quite hesitant to disqualify an attorney." *Id.* (quoting *Nyquist*, 590 F.2d at 1246).  "Except in cases of truly egregious misconduct likely to infect future proceedings, other means less prejudicial to the client's interest than disqualifying the counsel of [the Party's] choice are ordinarily available to deal with ethical improprieties by counsel." *Id.* at 1056 (citations omitted).

### III.    Analysis

### A.  Motion to Dismiss

The Complaint's various counts fall into three general categories of allegations.  Counts I, II, VI, and VII are all common-law claims dealing with the alleged formation and breach of a contract, or, in the alternative, a quasi-contract subject to some equitable remedy.  Counts III, IV, and V are separate torts, whether grounded in the common law or federal statutory causes of action.  Counts VIII and IX request specific remedies apart from the legal or equitable remedies sought in the other counts.  The Court takes them in that order.

### 1.    Contract, Fraud, and Quasi-Contract Claims

#### a.    Breach of Contract

The Complaint alleges that Butler, Price, and Augustine formed an oral contract sometime between 2011 and 2014, in which Butler and Price agreed to secure government contracts for EIC and then perform those contracts on EIC's behalf without being paid.  3d Am. Compl. ¶¶ 10–20.  The profits from those contracts went to Augustine.  *Id.* ¶ 26.  In turn, Augustine progressively sold his ownership stake in the company to Butler and Price, who would

eventually become co-owners after contributing roughly $600,000 in profits.  *Id.* ¶ 18.  The

Parties agree that there was no written contract, *see* Mot. at 4; Pls.' Opp'n to Defs.' Mot. to

Dismiss ("Opp'n") at 9–11, so if any contract existed, it must have been oral.

"To prevail on a claim of breach of contract, a party must establish (1) a valid contract

between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty;

and (4) damages caused by the breach."  *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187

(D.C. 2009).  Augustine and EIC argue that the Complaint fails on the first and third points,

contending that it does not adequately allege either the existence of a contract or a breach

thereof.  *See* Mot. at 4.

"For a contract to be enforceable, there must be (1) an agreement to all material terms,

and (2) intention of the parties to be bound.  In addition, mutuality of obligation must exist."

*Eastbanc, Inc. v. Georgetown Park Assocs. II, L.P.*, 940 A.2d 996, 1002 (D.C. 2008) (internal

quotations and citations omitted).  "A contract must be sufficiently definite as to its material

terms (which include, *e.g.*, subject matter, price, payment terms, quantity, quality, and duration)

that the promises and performance to be rendered by each party are reasonably certain."  *Id.*

(quoting *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 365, 370 (D.C. 1990)).  "All agreements

have some degree of indefiniteness and some degree of uncertainty," but "[a] contract is

enforceable if it is sufficiently definite so that the parties can be reasonably certain as to how

they are to perform" and its terms are "clear enough for the court to determine whether a breach

has occurred and identify an appropriate remedy."  *Id.* (internal quotations and citations omitted).

An oral contract's elements are identical to those of a written contract.  *See Ashrafi v. Fernandez*,

193 A.3d 129, 131 (D.C. 2018) ("[T]he elements of an oral contract are (1) an agreement to all

material terms and (2) intent of the parties to be bound.")

Defendants throw every possible argument against the wall to see if any stick.  First, they contend that the agreement lacks consideration because Augustine stood to gain nothing.  *See* Mot. at 5.  According to Defendants, "the plaintiffs would be producing value that they would exchange for equivalent value," such that "all of the benefit from the plaintiffs' generation of revenues, as alleged by the plaintiffs, apparently was to flow to the plaintiffs."  *Id.*  But the Complaint says no such thing.  Butler and Price allege that they worked without full compensation for their labor, instead permitting revenues from their contracts and labor to go to Augustine.  3d Am. Compl. ¶ 14.  In return, they obtained partial ownership of EIC, with their share of the company increasing progressively as they slowly bought Augustine out of his stake in the business.  *Id.* ¶¶ 17–18.

Second, Defendants argue that the agreement lacks mutuality of obligation because "the plaintiffs seemingly could have walked away from this arrangement at any time without penalty and demand[ed] their 'equity.'"  But the law of Louisiana (the state of EIC's incorporation) envisions just such an occurrence.  *See* La. Stat. Ann. § 12:1-1435(A) ("If a corporation engages in oppression of a shareholder, the shareholder may withdraw from the corporation and require the corporation to buy all of the shareholder's shares at full value.").  Defendants provide no legal authority to support their contention that no contract exists among business partners if it is theoretically possible for one or more partners to abandon the partnership at a future date.  It may be the case that a partner who walks away may lose the benefit of the contract or may not be entitled to compensation, but that's not what the Complaint alleges.  Instead, it claims that Augustine affirmatively terminated Butler and Price, thereby depriving them of the benefits of partial ownership of EIC.  *See* 3d Am. Compl. ¶¶ 38–39.

Third, Defendants suggest that the agreement lacks essential elements and material terms because Augustine never promised to return Plaintiffs' money in the event of a falling out. *See* Mot. at 6. In Defendants' words, "[t]here is no way for the court to fill in this missing term of the alleged contract," because "[a]ssuming stock actually had changed hands—which is not alleged[—]the plaintiffs would have no right to be paid for that stock upon termination of their services unless they had specifically agreed." *Id.* Relying on *REO Acquisition Group v. Federal National Mortgage Association*, 104 F. Supp. 3d 22, 27 (D.D.C. 2015), Defendants argue that "[w]ithout such a material term, the contract fails, and the complaint for breach of contract should be dismissed." Mot. at 6. But *REO* involved a dispute over how a buyer was going to finance its purchase of a collection of foreclosed houses from the seller. 104 F. Supp. 3d at 28. Fannie Mae believed that the contract's terms required REO to pay cash up front, while REO believed the contract permitted it to finance the purchase with secured transactions. *Id.* The Court held that the question of how REO would pay for the properties was a material term of the contract on which the parties had never agreed, and therefore there was no enforceable contract. *Id.* That's not the case here, where the Complaint alleges that the Parties agreed on payment terms and that Plaintiffs subsequently paid Defendants hundreds of thousands of dollars in contract revenues that otherwise would have gone into their own pockets. 3d Am. Compl. ¶ 39.

The disconnect, instead, is on the question of remedies for a breach. The Complaint seeks, first and foremost, "the value of the equity shares of Defendant EIC to which Plaintiffs are entitled." *Id.* at 18. It may be the case that Plaintiffs cannot recover "the value of their equity," but a Contract need not specify a remedy for breach at the outset. "If the terms of the contract are clear enough for the court to determine whether a breach has occurred and to identify an appropriate remedy, it is enforceable." *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774

A.2d 320, 327 (D.C. 2001).  From the face of the Complaint, the Court can conceive of at least

two potential remedies:  either money damages in the amount that Butler and Price allegedly

gave to Augustine to purchase equity, or specific performance of the contract through a transfer

of ownership rights to EIC.  Plaintiffs expressed their preference for the latter option at a hearing

on the Motion.  The Court takes no position at this stage of the litigation on whether these or

other remedies are appropriate, but does conclude that the Complaint adequately alleges the

contract's essential terms.

Finally, Defendants contend that no shares ever changed hands, so Plaintiffs cannot prove

that a contract ever existed.  *See* Mot. at 5–6.  It may be true that the alleged contract's

performance did not comply with Louisiana law; the Complaint contains little information about

the mechanics of executing the contract.  But "[t]o state a claim, a complaint need not assert that

the alleged contract is legal in all respects; rather illegality is an affirmative defense," and an

"affirmative defense such as illegality can be the basis for granting a Rule 12(b)(6) motion to

dismiss 'only when the [defense] is established on the face of the complaint.'"  *Francis v.*

*Rehman*, 110 A.3d 615, 621 (D.C. 2015) (quoting *Hafley v. Lohman*, 90 F.3d 264, 266 (8th Cir.

1996)).  Plaintiffs may have difficulty proving that money or shares ever changed hands, thereby

enabling them to claim some stake in EIC—but that's a question for summary judgment, not for

a motion to dismiss.  The Court does note, however, that the Complaint alleges that Augustine

prepared, signed, and filed with the federal government documents representing that Butler and

Price each owned 20% of EIC in 2015.  3d Am. Compl. ¶ 32.  It's possible that such documents

may be enough to substitute for shares of stock.

b.      *The Statute of Limitations*

Having established that the Complaint adequately alleges a contract and a breach, the

Court turns to Defendants' alternative argument that any claim for breach is barred by the

applicable statute of limitations.  *See* Mot. at 8.  In the District of Columbia, Plaintiffs must bring

a claim for breach of contract within three years of the breach.  *See* D.C. Code § 12-301(7);

*Eastbanc*, 940 A.2d at 1004 ("A cause of action for breach of contract accrues, and the statute of

limitations begins to run, at the time of the breach." (internal quotation omitted)).  In Defendants'

view, any enforceable contract must have existed by 2011, and any potential breach must have

occurred immediately, as Plaintiffs never received any of the "trappings of ownership" and so

never received any benefit of the contract.  *See* Mot. at 8.  If that's the case, then the statute

would have run in 2014—long before Plaintiffs filed their original Complaint on August 30,

2018.  *Id.*  The same arguments apply to Counts II, VI, and VII.  *See Halldorson v. Sandi Grp.*,

934 F. Supp. 2d 147, 154–55 (D.D.C. 2013) ("Under District of Columbia law, claims for

fraud/fraudulent inducement . . . are governed by a three-year statute of limitations." (citing D.C.

Code § 12-301(8) (prescribing a three-year limitations period for any claim "for which a

limitation is not otherwise specifically prescribed"))).

But that argument assumes the Complaint alleges an immediate breach.  "Where an

injury is not readily determined, '[a]t the latest . . . a cause of action accrues for limitations when

the plaintiff knows or by the exercise of reasonable diligence should know (1) of the injury, (2)

its cause in fact, and (3) some evidence of wrongdoing.'"  *Slate v. Pub. Def. Serv. for D.C.*, 31 F.

Supp. 3d 277, 313 (D.D.C. 2014) (quoting *Beard v. Edmondson & Gallagher,* 790 A.2d 541, 546

(D.C. 2002)); *see also News World Comm'cns, Inc. v. Thompsen*, 878 A.2d 1218, 1223 (D.C.

2005) ("A claim for unjust enrichment only accrues . . . when the enrichment becomes unjust;

the statute of limitations starts to run upon the occurrence of the wrongful act giving rise to a duty of restitution[, in this case, refusal to pay for services already rendered]." (internal quotation omitted)).

According to the Complaint, Butler's corporate title at EIC was "President and Managing Partner of the Business Unit." 3d Am. Compl. ¶ 23. Price was also described as "Managing Partner of the Business Unit." *Id.* From 2014–2016, the two received no salary or payment as independent contractors, an indication either that they were either working *pro bono* or that they were co-owners of the business and were applying their share of the profits to the purchase of a larger stake in the company. *Id.* ¶¶ 29–30. Moreover, Augustine allegedly made representations to the federal government that Butler and Price each owned 20% of the company. 3d Am. Compl. ¶ 32. All those allegations would be consistent with Plaintiffs' understanding that Augustine was continuing to hold up his end of the bargain. As the Complaint alleges, it was only in 2017 that Augustine breached the contract by purporting to terminate Butler and Price from the company. 3d Am. Compl. ¶ 38. If that's the case, then Plaintiffs timely filed suit.

"This Circuit has 'repeatedly held that courts should hesitate to dismiss a complaint on statute of limitations grounds based solely on the face of the complaint.'" *Slate*, 31 F. Supp. 3d at 312–13 (quoting *Firestone v. Firestone,* 76 F.3d 1205, 1209 (D.C. Cir. 1996)). "[D]ismissal is appropriate only if the complaint on its face is conclusively time-barred." *Id.* at 313 (internal quotation omitted). Further evidence about the timeliness of the claims may arise at summary judgment, but at this point, the Court cannot conclusively determine that any count is time-barred.

Because the Complaint adequately alleges a contract and breach, and because Plaintiffs seem to have filed their suit within the applicable limitations period, the Court denies the Motion to Dismiss as to Count I.

      *c.*     *Fraudulent Inducement*

Having successfully alleged the existence of a contract, the Complaint alleges in Count II that Augustine committed fraud both at the outset (to induce Butler and Price into entering into the contract) and throughout the ensuing years (to induce them to continue to perform their end of the bargain), even though Augustine never intended to make good on his obligations.  3d Am. Compl. ¶¶ 67–73.

Defendants begin by repeating their arguments about the lack of a contract in the first place, arguing that they cannot be liable for inducing Butler and Price to bind themselves by a contract that never materialized.  *See* Mot. at 8; *see also In re U.S. Office Prods. Co. Sec. Litig.*, 251 F. Supp. 2d 77, 101 (D.D.C. 2003) ("[If there is no] contract, no claims requiring inducement to enter [a] contract can exist.").[3]  Defendants also argue that the claim is barred by the statute of limitations for the same reasons as Count I.  *See* Mot. at 9.  Those arguments both fail for the reasons stated above.

Defendants next contend that Plaintiffs cannot allege both a breach of contract and fraudulent inducement because the latter claim necessarily requires rescission of the contract. *See id.*  They argue that "the plaintiffs must elect either to void the contract or to sue for contract damages and cannot have it both ways.  Since they do not ask for the contract . . . to be voided,

---

[3] Contrary to Plaintiffs' argument in opposition to this point, *see* Opp'n at 11, fraudulent inducement is not an alternative to a breach-of-contract claim and cannot succeed absent the existence of an enforceable contract.  But that error is not fatal to the claim given that the Complaint states a claim for breach of contract.

and since they claim precisely the same relief in both counts, their claim is duplicative of their contract claim." *Id.* (citing *Carter v. Urban Serv. Sys. Corp.*, 324 F. Supp. 3d 19, 22 (D.D.C. 2018)).  But this argument confuses the legal theory underlying the allegations.  "Traditionally, a person who was induced to enter into a contract by a misrepresentation has several common law causes of action, including fraud in the inducement sounding in tort and rescission sounding in contract.  The distinction between these two may be important because each action requires a different level of proof and allows for different remedies." *In re Estate of McKenney*, 953 A.2d 336, 341 (D.C. 2008).

Although the Complaint does not explicitly state that Count II sounds in tort, the damages Plaintiffs claimed to have suffered as a result of the alleged inducement, including "loss of revenue and profits, diminution of business value, [and] loss of business opportunity," can be remedied only through money damages, not by rescission of the contract.  3d Am. Compl. ¶ 73. It would make little sense for Plaintiffs to seek rescission at this point, as they have already performed their part of the alleged bargain and are seeking to force Defendants to perform on their end.  *See Steiner v. Am. Friends of Lubavitch (Chabad)*, 177 A.3d 1246, 1255 (D.C. 2018) (outlining standard for when a party may seek rescission) (quoting Restatement (Second) of Contracts § 164 (Am. Law Inst. 1981)).  Rescission is usually employed by *defendants* who are being sued to force them to perform on a contract they allege they were deceived into entering in the first place.  *See, e.g.*, *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 613 A.2d 916 (D.C. 1992) (dismissing fraudulent inducement claim and enforcing arbitration award).  Instead, Plaintiffs seem to be seeking to "recover monetary damages in tort," which they may only do if they "establish[] all of the elements of common law fraudulent misrepresentation . . . by clear

and convincing evidence." *In re Estate of McKenney*, 953 A.2d at 341–42 (citing Restatement

(Second) of Torts § 525 (Am. Law Inst. 1977) (internal quotation omitted)).

But the relationship between Plaintiffs' claim for breach of contract and their allegation

of fraudulent inducement presents other problems beyond the question of rescission.  To state a

claim for fraudulent inducement, the Complaint must allege that "(1) the defendant[s] made a

false representation, (2) the representation was in reference to a material fact, (3) the

defendant[s] had knowledge of its falsity, (4) the defendant[s] intended to deceive, (5) the

plaintiffs acted in reliance on the misrepresentation, and (6) the reliance was reasonable." *In re*

*U.S. Office Prods.*, 251 F. Supp. 2d at 100 (citing *R&A, Inc. v. Kozy Korner, Inc.*, 672 A.2d

1062, 1066 (D.C. 1996); *Hercules*, 613 A.2d at 923).  "Fraudulent inducement to enter a contract

requires [that the] misrepresentation or omission . . . pertain[] to an essential term of a contract

and the intent to convince a plaintiff to enter the contract." *Id.* (citing *Haynes v. Kuder*, 591

A.2d 1286, 1290 n.5 (D.C. 1991)).  To comply with Rule 9(b), "the pleader [must] provide the

'who, what, when, where, and how' with respect to the circumstances of the fraud." *Anderson v.*

*USAA Cas. Ins. Co.*, 221 F.R.D. 250, 253 (D.D.C. 2004) (quoting *DiLeo v. Ernst & Young,* 901

F.2d 624, 627 (7th Cir. 1990)).

Courts tend not to allow plaintiffs to allege fraudulent inducement alongside claims for

breach because "[t]here is a risk of turning every breach of contract suit into a fraud suit, of

circumventing the limitation that the doctrine of consideration is supposed . . . to place on

making all promises legally enforceable, and of thwarting the rule that denies the award of

punitive damages for breach of contract." *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1354

(7th Cir. 1995) (Posner, J.).  In the District of Columbia, the claims may stand side-by-side in

one of three instances:  (1) when the tort "exist[s] in its own right independent of the contract,

and any duty upon which the tort is based . . . flow[s] from considerations other than the contractual relationship," *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008); (2) when the defendant makes some statement "prior to" and "independent of the contract" that deceives the plaintiff into agreeing to be bound by the contract, *Ludwig & Robinson, PLLC v. Biotechpharma, LLC*, 186 A.3d 105, 111 (D.C. 2018) (quoting *Marvin Lumber & Cedar Co. v. PPG Indus.*, 223 F.3d 873, 885 (8th Cir. 2000)); and (3) when the promise to perform on the contract is itself fraudulent, "if at the time of its making, the promisor had no present intention of carrying it out," *Va. Acad. of Clinical Psychologists v. Grp. Hospitalization and Med. Servs., Inc.*, 878 A.2d 1226, 1234 (D.C. 2005). Plaintiffs have not provided any clarity about which of those categories they believe best fits their claim.

The Complaint alleges that in 2011 Augustine said he would sell equity in the company to Plaintiffs without the intention of doing so, 3d Am. Compl. ¶ 68; that Plaintiffs agreed to the deal because of that statement, *id.* ¶ 71; that Plaintiffs worked for several years in reliance on that promise, *id.*; that they received subsequent reassurances of progressively accrued equity, *id.* ¶ 72; and that Augustine eventually went back on his word and denied them what they had paid for with money they otherwise would have kept for themselves, *id.* ¶¶ 38–39. Plaintiffs thus identify two potential misrepresentations: (1) that Augustine agreed to the contract in 2011 but even then did not intend to perform his obligations under the contract and (2) that Augustine lied about Plaintiffs' accrual of equity during the course of performance to keep them performing their obligations under the contract.

Neither of those allegations falls under the category articulated in *Ludwig*. Plaintiffs do not allege that Augustine misrepresented anything about the nature of EIC that might have made the deal appear better than it really was. For instance, Augustine never claimed that EIC was

more valuable than he secretly believed it to be; that EIC had lucrative government contracts that later turned out not to exist; or that he offered to sell the company when, in truth, someone else owned shares that he had no legal right to convey to Butler or Price.  Such statements would constitute "fraud and misrepresentation in matters *leading up to* procurement of the contract" rather than being subsumed within the contract itself and would thereby state a claim.  *Ludwig*, 186 A.3d at 111 (quoting *Choharis*, 961 A.2 at 1088 n.11) (emphasis added); *see also id.* at 111–12 ("[Plaintiff] made no claim that, prior to [Plaintiff's] taking out the policy, the insurance company made misrepresentations about (for example) the scope of the offered coverage or the financial strength of the company and its ability to meet its obligations under issued policies." (citing *Choharis*, 961 A.2d at 1088 n.11)).  But there is no such allegation in the Complaint.

The allegation that Augustine was lying when he entered the contract does fit squarely within the rule of *Virginia Academy*.  There, the D.C. Court of Appeals confirmed that the party who breaches a contract may be held liable for fraudulent misrepresentation, in addition to breach, "where the evidence shows that a promise was made without the intent to perform, or that the promisor had knowledge that the events would not occur."  878 A.2d at 1234 (quoting *Bennett v. Kiggins*, 377 A.2d 57, 60–61 (D.C. 1977)).  But it emphasized the difficulty of holding the promisor liable when the only evidence of the promisor's intent is the breach itself.  *Id.*

> When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action . . . .  Otherwise any breach of contract would call for such a remedy.  *The mere breach of a promise is never enough in itself to establish the fraudulent intent.*  It may, however, be inferred from the circumstances, such as the defendant's insolvency or other reason to know that he cannot pay, or his repudiation soon after it is made, with no intervening change in the situation, or his failure to attempt any performance, or his continued assurances after it is clear that he will not do so.

*Id.* at 1234–35 (quoting W. Page Keeton et al., *Prosser and Keaton on the Law of Torts* § 109 (5th ed. 1984)) (emphasis added).

The Complaint's allegations, however, fit Prosser's definition exactly.  Plaintiffs claim that "Defendants had no intention at the time they made the representations to Plaintiffs or any time thereafter to tender to Plaintiffs an equity interest in Defendant EIC, therefore the Defendants knew that their representations regarding Plaintiffs' ability to earn equity in EIC were false when they were made."  3d Am. Compl. ¶ 69.  The Complaint alleges no circumstances that might tend to show that Augustine was lying when he agreed to the contract, no indications that he knew performance would be impossible, and no allegation that Augustine repudiated the contract immediately after making it.  In fact, Plaintiffs allege that Augustine gave every indication that he *was* performing on the contract until 2017, such as his signed representations to both Plaintiffs and the federal government that Plaintiffs each owned 20% of the company in 2014 and 2015.  *Id.* ¶¶ 33–35.  The first sign of Augustine's intent to breach came in 2017—six years after contract formation.  *Id.* ¶¶ 36–41.  "The mere breach of a promise is never enough in itself to establish the fraudulent intent."  *Va. Acad.*, 878 A.2d at 1234 (quoting Prosser & Keaton § 109).[4]

The Complaint's allegations that Augustine continued to deceive Plaintiffs by giving assurances throughout the years bear some resemblance to the facts of *Ludwig*.  There, a pharmaceutical company retained a law firm to handle intellectual property matters.  186 A.3d at 106.  The representation agreement included an hourly fee structure and permitted the firm to

---

[4] Defendants briefly raise this argument.  *See* Mot. at 8–9 (citing *Va. Acad.*, 878 A.2d at 1235).  In turn, Plaintiffs make no attempt to engage with the case law and merely restate the Complaint's allegations corresponding with the elements of fraud.  *See* Opp'n at 11–12.  On this point (and others), the Parties' briefing was largely unhelpful in applying D.C. law.

withdraw from the representation if the company failed to pay.  *Id.*  Of course, the company

never paid its bills, so the law firm threatened to withdraw.  *Id.* at 107.  The company assured the

firm of its ability to pay, representing that it could rely on an existing line of credit and revenue

from investments in its subsidiary company.  *Id.*  The parties agreed to modify the fee structure,

deferring some hourly fees in exchange for an additional sum to paid on contingency.  *Id.*

Payment never came, so the Parties negotiated a second amendment containing an even larger

contingency payment.  *Id.*  The law firm eventually had to take the company to arbitration, where

it prevailed on its breach-of-contract claim and received a sizable award.  *Id.*  The firm then

pursued separate claims for fraud and conspiracy (which were unavailable in arbitration) in a

lawsuit.  *Id.* at 107–08.  The Superior Court dismissed the claims, holding, among other

conclusions, that the fraud claims were duplicative of the contract damages and therefore could

not stand as separate claims.  *Id.*  It relied on *Choharis*, which held that a tort allegation of fraud

"must exist in its own right independent of the contract, and any duty upon which the tort is

based must flow from considerations other than the contractual relationship.  The tort must stand

as a tort even if the contractual relationship did not exist."  961 A.2d at 1089.  The Superior

Court found that the continued misrepresentations merely concealed the company's breach of the

contract and caused no independent harm that had not already been redressed by contract

damages.  186 A.3d at 110.

   The Court of Appeals reversed.  *Id.* at 109–16.  Because the company and the law firm

had an "open-ended engagement" and because the law firm had a contractual right to withdraw,

each representation that the company was about to pay up and had access to funds available for

that purpose constituted a separate "inducement" to keep the law firm at the table.  *Id.* at 110–11.

The company knew that there was no existing line of credit and that it could not pay its bills, but

it continued to negotiate amendments to the fee agreement under false pretenses to prolong the scheme.  *Id.*  Thus, while an action for breach of contract may have sufficed to give the law firm the benefit of the original bargain, the firm needed a separate claim to account for the independent harms caused by the misrepresentation:  the additional work it did after threatening to withdraw (twice) and the legal actions required to enforce the various amendments to the contract.  *Id.*

Here, Plaintiffs do not allege that the misrepresentations in 2015 and 2016 induced them to enter into a new bargain with Augustine or caused some new injury that would have arisen "even if the contractual relationship did not exist."  *Choharis*, 961 A.2d at 1089.  "[C]onduct occurring during the course of a contract dispute may be the subject of a fraudulent . . . misrepresentation claim when there are facts *separable from the terms of the contract upon which the tort may independently rest and when there is a duty independent of that arising out of the contract itself,* so that an action for breach of contract would reach none of the damages suffered by the tort."  *Id.* (emphasis added).  "Even a willful, wanton or malicious breach of a contract . . . cannot support a claim for fraud."  *Id.* (internal quotation omitted).  Augustine's alleged misrepresentations merely deceived Plaintiffs into thinking that they were getting the benefit of the bargain; there was no separate harm.  Misleading statements about a promisor's willingness or ability to perform (made during the course of performance) are not separately actionable fraud, even when those statements prevent the promisee from discovering a breach.  *Ludwig*, 186 A.3d at 112–13 (citing *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 450–52 (D.C. 2012)).  Any harm resulting from Augustine's alleged statements is "wholly dependent" on the contract and can be fully redressed through contract damages on the breach.  *Id.* at 113.

Count II does not state an actionable claim for fraudulent inducement, whether under the general pleading standards of Federal Rule of Civil Procedure 8(a) or the more exacting standards for pleading fraud under Rule 9(b).  At bottom, Plaintiffs' allegations are the sort of conclusory fraud claims that courts regularly reject as nothing more than an attempt to pile punitive tort damages onto contract disputes.  *See, e.g.*, *Shandong Yinguang Chem. Indus. Joint Stock Co., Ltd. v. Potter*, 607 F.3d 1029, 10334 (5th Cir. 2010) ("However, 'failure to preform, standing alone, is no evidence of the promissor's intent not to perform when the promise was made.'" (quoting *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986))).  The Court will dismiss the count.

### d.    Promissory Estoppel

Count VI argues that Augustine promised to bring Butler and Price on as business partners, that they worked for EIC for several years in reliance on that promise, and that Defendants are now estopped from retracting the promise.  3d Am. Compl. ¶¶ 97–102. "Promissory estoppel provides a party with a remedy to enforce a promise where the formal requirements of a contract have not been satisfied, often serving as a substitute for one of these formal requirements, usually consideration." *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 279 (D.C. Cir. 2009) (citing *Bender v. Design Store Corp.,* 404 A.2d 194, 196 (D.C. 1979)). "Therefore, when a contract fails for lack of consideration, courts will, in some circumstances, enforce the promise where the promisee has detrimentally relied." *Id.*  Promissory estoppel and unjust enrichment (Count VII) are variations on actions in quasi-contract, which function as substitutes for contractual remedies "even though no intention of the parties to bind themselves contractually can be discerned." *Bloomgarden v. Coyer*, 479 F.2d 201, 210 (D.C. Cir. 1979).

Defendants seize on this point to argue that a Complaint cannot allege both breach of contract and quasi-contract claims.  *See* Mot. at 13.  Defendants are correct that "courts tend not to allow [such] action[s] to proceed in the presence of an actual contract between the parties." *Id.* (quoting *Vila*, 570 F.3d at 280).  They argue that the claims duplicate Count I and should therefore be dismissed as cumulative.  *Id.*

"There is, of course, no need to resort to [quasi-contract] when the evidence sustains the existence of a true contract, either express or implied in fact."  *Bloomgarden*, 479 F.2d at 210. "One who has entered into a valid contract cannot be heard to complain that the contract is unjust, or that it unjustly enriches the party with whom he or she has reached agreement." *Jorden Keys & Jessamy, LLP v. St. Paul Fire and Marine Ins. Co.*, 870 A.2d 58, 64 (D.C. 2005). But in every case Defendants cite for that proposition, the existence of the contract was never in dispute.  *See, e.g., He Depu v. Yahoo! Inc.*, 306 F. Supp. 3d 181, 193–94 (D.D.C. 2018) (collecting cases), *rev'd on other grounds* 950 F.3d 897 (D.C. Cir. 2020).  Here, there is no written contract, and Defendants have themselves contested that the Parties ever formed an enforceable oral agreement.  *See* Mot. at 4 ("The plaintiffs have successfully alleged neither a breach of contract nor a contract in the first instance.").  By pleading quasi-contractual counts for promissory estoppel and unjust enrichment, Plaintiffs acknowledge that they may be unable to prove the existence of an enforceable contract and would thereby lose their claim for breach of contract in Count I.  *See* Opp'n at 11 ("While Plaintiffs cannot prevail on both contract and quasi-contract claims, they may plead all of these counts in the alternative under the federal rules.").  If it's the case that Plaintiffs cannot prove the existence of a valid "contract in the first instance," *id.*, then they may rely on quasi-contractual theories of liability to seek restitution of the benefits they allegedly conferred on Defendants in reliance on Defendants' alleged

assurances.  But if they're able to prove that the Parties validly contracted, then Counts VI and VII will drop out of the case.

Defendants also challenge the sufficiency of Count VI's allegations.  "In order to find a party liable on a theory of promissory estoppel, there must be evidence of a promise, the promise must reasonably induce reliance upon it, and the promise must be relied upon to the detriment of the promisee."  *Simard v. Resolution Tr. Corp.*, 639 A.2d 540, 552 (D.C. 1994).  Defendants claim that the Complaint never alleges that Augustine promised "to tender the value of the plaintiffs' equity upon the termination of the plaintiffs' services."  Mot. at 13 (internal quotation and alterations omitted).  But that's not the promise alleged here.  Instead, the Complaint alleges that Augustine "represented to Plaintiffs that if Plaintiffs worked on behalf of Defendants and generated revenue for the Business Unit, then Defendants would tender to Plaintiffs equity in Defendant EIC commensurate with the revenue the Business Unit generated, less direct costs and certain indirect costs."  3d Am. Compl. ¶ 98.  Tendering the *value* of that equity at termination would have been a remedy for failure to transfer ownership, not the subject of the original promise.  Instead, the Complaint alleges that Augustine promised to sell a share of the company to Plaintiffs, *id.* ¶ 98, that Plaintiffs worked without compensation for several years in reliance on that promise, *id.* ¶ 99, and that they got nothing to show for their work in the end, *id.* ¶ 102.  The Complaint adequately states a claim for promissory estoppel.

        *e.*     *Unjust Enrichment*[5]

Count VII, another quasi-contract count, alleges that Butler and Price reasonably conferred a benefit on Augustine and EIC, that it would be unjust for Defendants to retain that

---

[5] The Complaint labels Count VII as a claim for both unjust enrichment and *quantum meruit*.  *See* 3d Am. Compl. ¶ 103.  "Quantum meruit may refer to either an implied contractual or a quasi-contractual duty requiring compensation for services rendered."  *New Econ. Capital, LLC*

benefit, and that equitable principles demand that Defendants return the benefit to Plaintiffs. *Id.* ¶¶ 103–11. Beyond the same arguments Defendants raise above as to the statute of limitations and duplication of the contract claim, *see* Mot. at 16, they contend that the Complaint fails to state a claim for unjust enrichment because either (1) Plaintiffs received a benefit rather than conferring one on Defendants, or (2) Plaintiffs were aware the arrangement carried some risk for them, that they accepted the risk, that they ended up with the short end of the stick, and that it would not be unjust to permit Defendants to retain the benefits of the agreement, *see id.* at 14–15.

"Like promissory estoppel, unjust enrichment provides a party with a remedy to unwind entanglements that may have arisen from a failed agreement, for instance, . . . where the agreement is too indefinite to be enforced." *Vila*, 570 F.3d at 280 (internal quotations omitted). "For [Plaintiffs] to recover . . . , [they] must show that [Defendants were] unjustly enriched at [their] expense and that the circumstances were such that in good conscience [Defendants] should make restitution." *Thompsen*, 878 A.2d at 1222 (quoting *Vereen v. Clayborne*, 623 A.2d 1190, 1194 (D.C. 1993)). In other words, "[u]njust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Id.*

---

*v. New Mkts. Capital Grp.*, 881 A.2d 1087, 1095 (D.C. 2005) (internal quotation omitted). The latter theory "is more commonly known as a theory of unjust enrichment." *Vereen v. Clayborne*, 623 A.2d 1190, 1194 (D.C. 1993). Although courts have articulated slightly different tests for stating a quasi-contractual *quantum meruit* claim, *see* Mot. at 14–15 (comparing cases), the two labels mean the same thing in this context. If anything, *quantum meruit* is a method for calculating the appropriate remedy for unjust enrichment. That clarification resolves arguments Defendants raise in their Reply brief discussing the lack of allegation of an implied-in-fact contract. *See* Defs.' Reply to Opp'n to Mot. to Dismiss for Failure to State Claims at 11, ECF No. 32.

Defendants argue that the Complaint mischaracterizes the nature of Plaintiffs' relationship to EIC.  Rather than working to generate revenue and thereby purchase equity in the company, Defendants claim that the Plaintiffs merely worked for an "opportunity" to buy the company, "and it didn't work out."  Mot. at 15.  "Although [Plaintiffs] assert that they expected to buy the company, the relationship ended before that happened."  *Id.* at 14.  Of course, the Complaint does not assert that Butler and Price "expected to buy the company" at some time after they began working at EIC; it alleges that they *were* buying the company by foregoing salaries and directing revenue from their contracts to Augustine.  3d Am. Compl. ¶ 106.  Although Defendants characterize the affair as a "scheme meant to benefit . . . the plaintiffs, not the defendants," Mot. at 14, that argument neglects the significant, uncompensated work that Butler and Price allegedly rendered for Defendants' benefit, 3d Am. Compl. ¶ 106.  Moreover, Defendants claim that "[h]ad [Plaintiffs] wished to protect their 'equity,' they could have [done so] with a specific agreement.  They did not."  Mot. at 14.  That's a textbook reason for quasi-contract theories of equity jurisprudence.

Even assuming that there was no contract, Butler and Price allege that they worked for EIC for free for several years with the understanding that they were being paid in the form of equity.  3d Am. Compl. ¶¶ 105–06.  Defendants allegedly accepted the benefit of Plaintiffs' work and even led them to believe that they were accruing equity by filing forms with the federal government listing Butler and Price as equity partners.  *Id.* ¶¶ 107–09.  If Plaintiffs cannot recover under a breach-of-contract theory, they still may be eligible for restitution of the value of their work under a theory of unjust enrichment.  *Id.* ¶ 111.  Count VII properly states a claim for unjust enrichment.

## 2.      Remaining Tort Claims

Moving on from the Complaint's contract and quasi-contract counts, the Court turns to Plaintiffs' other tort claims:  invasion of privacy (Count III), a Stored Wire and Electronic Communications Act violation (Count IV), and fraudulent filing of tax returns (Count V).

### a.      Invasion of Privacy

Count III alleges that after Augustine purported to terminate Plaintiffs, he (or his agent) accessed Butler's and Price's corporate e-mail accounts and corresponded with Butler's business contacts without revealing to the recipients that he wasn't Butler (or that Butler no longer worked at EIC).  *Id.* ¶¶ 74–81.  Count III claims that Augustine "thus appropriated Butler's name for [his] own benefit, capitalizing on the reputation Butler had earned through his hard work for [his] own benefit and without permission."  *Id.* ¶ 78.

Defendants' primary argument on this front is that the Complaint lacks any allegation that Augustine *published* Plaintiffs' private information or otherwise defamed Plaintiffs.  *See* Mot. at 9–10.  This line of reasoning confuses invasion of privacy with defamation.  Defendants can be forgiven for the confusion, as the Complaint labels Count III "Defamation (Invasion of Privacy)."  3d Am. Compl. ¶ 74.  The label is a misnomer.

The concept of a common-law right to privacy grew to some extent out of protections against defamation beginning in the late nineteenth century.  *See* William L. Prosser, *Privacy*, 48 Calif. L. Rev. 383, 383–384 (1960) (citing Samuel D. Warren and Louis D. Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193 (1890)).  Although the distinctions between the two causes of action were "well known" by the mid-twentieth century, "there have been overlappings from the beginning."  John W. Wade, *Defamation and the Right of Privacy*, 15 Vand. L. Rev. 1093, 1094 (1961.  It was Prosser who developed and classified the various causes of action courts eventually recognized to vindicate privacy rights:  intrusion upon seclusion, public disclosure,

false light, and commercial appropriation.  *See* Kenneth S. Abraham and G. Edward White, *The Puzzle of Dignitary Torts*, 104 Cornell L. Rev. 317, 338–40 (2018); *compare* Restatement (Second) of Torts ch. 28 (classifying causes of action for defamation) *with id.* ch. 28A (classifying causes of action for invasion of privacy); *see also Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1229 (7th Cir. 1993) (Posner, J.) (collecting cases).

Defendants' arguments that the Complaint does not state a claim for defamation, while understandable in light of the Complaint's imprecise labeling, are therefore unavailing.  *See* Mot. at 9 ("The defendants are at a loss as to what the plaintiffs plausibly suggest could be defamatory.").  Although Plaintiffs used the term, they clearly do not allege defamation.

Defendants' arguments against a claim for invasion of privacy fare no better.  Under D.C. common law, "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." *Tripp v. United States*, 257 F. Supp. 2d 37, 40–41 (D.D.C. 2003) (quoting Restatement (Second) of Torts § 652C) (citing *Vassiliades v. Garfinckel's*, 492 A.2d 580, 587 (D.C. 1985)).  "[T]he interest protected by this proposition is in the nature of an individual property right in the exclusive use of one's own identity in so far as the use of one's name or likeness may be of benefit to him . . . or others." *Id.* (emphasis removed) (quoting Restatement (Second) of Torts § 652C, cmt. a).  "The common form of invasion of privacy under [this rule] is the appropriation and use of the plaintiff's name or likeness to advertise the defendant's business or product, or for some similar commercial purpose." *Id.* (quoting Restatement (Second) of Torts § 652C, cmt. b).  "Incidental use . . . for a purpose other than taking advantage of a person's reputation or the value associated with his name will not result in actionable appropriation." *Vassiliades*, 492 A.2d at 592.

As Judge Sullivan noted in his extensive treatment of the difference between various forms of invasion of privacy in *Tripp*, the D.C. Court of Appeals has recognized a cause of action for misappropriation of likeness, but "[n]either D.C. case law . . . nor federal case law interpreting it provide much guidance" on the subject.  257 F. Supp. 2d at 42.  Not much has changed since Judge Sullivan made that observation.  *See, e.g.*, *Teltschik v. Williams & Jensen, PLLC*, 683 F. Supp. 2d 33, 55 (D.D.C. 2010) (dismissing count for failure to state a claim).

The cases do establish, however, that Defendants' sole argument against Count III is misdirected.  Defendants contend that Count III fails to state a claim because it does not allege that Augustine ever *published* Butler's private information to third parties.  *See* Mot. at 10 ("The plaintiffs claim no revelation of a private fact.  There is alleged no publication of fact, defamatory or private.").  Defendants rely on *Smith v. Clinton*, 253 F. Supp. 3d 222, 242–43 (D.D.C. 2017), but *Smith* dealt with the torts of defamation and placing a person in a false light.  False light, although also falling under the category of invasion of privacy, is distinct from misappropriation of likeness and therefore has different elements.  *Compare* Restatement (Second) of Torts § 652C (misappropriation of likeness) *with id.* § 652E (false light).  The same goes for the Defendants' other citations, which all involved either other forms of invasion of privacy or defamation.  *See* Defs.' Reply to Opp'n to Mot. to Dismiss for Failure to State Claims ("Reply") at 5, ECF No. 32 (citing *Armstrong v. Thompson*, 80 A.3d 177, 188–89 (D.C. 2013) (false light and publication of private facts (citing Restatement (Second) of Torts § 652E)); *Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 710–12 (D.C. 2009) (public disclosure of private facts and intrusion upon seclusion (citing Restatement (Second) of Torts §§ 652B, 652D)); *Steinbuch v. Cutler*, 463 F. Supp. 2d 1, 3 (D.D.C. 2006) (defamation); *Conejo v. Am. Fed'n of Gov't Emps. AFL-CIO*, 377 F. Supp. 3d 16, 32–33 (D.D.C. 2019) (false light (citing

*Armstrong*, 80 A.3d at 188–89))).  None of those cases considered actions for misappropriation

of likeness or had reason to consider the elements or illustrations set out in § 652C of the

Restatement or the corresponding section of the D.C. Court of Appeals' opinion in *Vassiliades*.

*See* 492 A.2d at 592–93.

To be sure, language in *Armstrong* (taken from comments in *Randolph*) unequivocally

states that "the 'publicity' requirement for a publication of private facts claim is the same for all

invasion of privacy torts."  80 A.3d at 189.  But neither of those opinions had any occasion to

consider misappropriation of name or likeness, and such generic language does not alter the

elements of the tort as laid out in the Restatement and adopted in *Vassiliades*.

Misappropriation of likeness does not require publication of private information; it

requires only that the tortfeasor "appropriate[] to his own use or benefit the name or likeness of

another."  Restatement (Second) of Torts § 652C.  To be sure, the typical case involves "[u]sing

a celebrity's . . . name or picture in advertising without his consent," *Haynes*, 8 F.3d at 1229, but

publication is not an absolute requirement so long as the Complaint alleges that Defendants' use

of Butler's name was to Defendants' "benefit," Restatement (Second) of Torts § 652C.  The

Restatement's illustrations bear this out:

> A, a private detective, seeking to obtain information as to the
> relations of B's wife with C, impersonates B, and so induces others
> to disclose to him confidential information that they would not
> otherwise have disclosed. A has invaded B's privacy.

*Id.*, cmt. b., illus. 3.  In this scenario, it is enough that A use B's name to obtain information of

commercial value to him.  There is no publication requirement.

"[W]here the D.C. Court of Appeals has denied plaintiffs relief on a misappropriation of

name or likeness theory, it has relied heavily on the lack of 'value' associated with mention or

use of the plaintiff's name or likeness."  *Tripp*, 257 F. Supp. 2d at 42.  The Complaint clearly

alleges that Butler's name, while it may not have had any value to the general public, had

commercial value to Defendants because it was Butler who had developed the particular business

contact with whom Augustine allegedly corresponded.  3d Am. Compl. ¶ 78.  To the extent that

Defendants were attempting to bolster's EIC's business by trading on Butler's reputation in the

relevant business community, without Butler's knowledge or permission, they would be liable

for misappropriation of name or likeness.

One of Defendants' arguments here, however, does have merit.  In addition to alleging

that Augustine accessed Butler's email and corresponded with at least one of his business

contacts, the Complaint also claims that "Defendants may have also actively impersonated Price

since Price's departure from EIC, thus appropriating Price's name for their benefit as well."  *Id.*

¶ 79.  This allegation seems to be mere conjecture and does not "raise a right to relief above the

speculative level."  *Twombly*, 550 U.S. at 555.  The Court therefore grants the Motion to Dismiss

as to the allegation that Augustine misappropriated Price's likeness and dismisses that portion of

the Complaint without prejudice.  The rest of Count III remains in place.

### b.     *Stored Wire and Electronic Communications Act Violation*

Count IV alleges a single violation of the Stored Wire and Electronic Communications

Act, 18 U.S.C. §§ 2701–13.  3d Am. Compl. ¶¶ 82–87.  The Act criminalizes "intentionally

access[ing] without authorization a facility through which an electronic communication service

is provided" or "intentionally exceed[ing] an authorization to access that facility" and "thereby

obtain[ing], alter[ing], or prevent[ing] authorized access to a wire or electronic communication

while it is in electronic storage in such system."  18 U.S.C. § 2701(a).  The Act also creates a

civil cause of action permitting victims to sue offenders for equitable relief, damages, and

attorney fees.  *Id.* § 2707.

The Complaint alleges that Augustine "intentionally accessed Butler's former EIC email account without authorization" ("or exceeded any authorization Augustine may have had") about a year after Butler left the company.  3d Am. Compl. ¶ 84.  But it does not allege the existence of any agreement between Butler and the company that Butler's email account was his alone, that the company would have no access to data stored on its own servers, or that EIC was some sort of partnership that dissolved upon his termination and that caused Butler to retain a property right in his email account.  The very fact that the Complaint names EIC as a Defendant in this action renders the allegation a non sequitur.  "For [Plaintiffs'] claim to stand, it would require the Court to assume that, paradoxically, [EIC] is the [electronic communications] facility at issue, yet that facility has limited access to itself."  *State Wide Photocopy, Corp. v. Tokai Fin. Servs., Inc.*, 909 F. Supp. 137, 145 (S.D.N.Y. 1995).

Plaintiffs cite no cases supporting the proposition that a company cannot access its own email servers.  The cases they do cite merely establish that e-mail servers are protected communications facilities under the Act and that hackers may not access them without authorization.  *See* Opp'n at 15–16 (citing, e.g., *Hately v. Watts*, 917 F.3d 770, 794 (4th Cir. 2019); *In re Google Inc. Cookie Placement Consumer Privacy Litig.*, 806 F.3d 125, 147–48 (3d Cir. 2015)).  It cannot be the case that federal law prohibited EIC from accessing its own email servers absent some contract that protected those accounts individually.  *See Walker v. Coffey*, No. 19-1067, 2020 WL 1886301, at *8 (3d Cir. Apr. 16, 2020) (holding that an employee's "work emails . . . fall outside of the scope of the [Stored Communication Act's] protection" when voluntarily disclosed by employer).  The Court therefore dismisses Count IV without prejudice.

### c.     *Fraudulent Filing of Tax Returns.*

Count V alleges two separate predicate facts to support its allegation that Defendants violated 26 U.S.C. § 7434, which punishes the fraudulent filing of tax returns.  First, the Complaint alleges that Augustine willfully failed to file returns on EIC's behalf for tax years 2014, 2015, and 2016, thereby misrepresenting Butler and Price's status as EIC's partial owners and subjecting them to IRS audit or penalty (and potentially affecting their security clearances). 3d Am. Compl. ¶¶ 93–95.  Second, it claims that Augustine willfully mischaracterized Butler and Price as independent contractors rather than owners for tax year 2017, reporting their limited income from that year on a Form 1099 and thereby omitting any mention of the company's gains and losses, which were supposed to have been passed through to them as owners of an S Corporation under the Tax Code.  3d Am. Compl. ¶¶ 89–92.

The statute creates a civil cause of action against "any person [who] willfully files a fraudulent information return with respect to payments purported to be made to any other person."  26 U.S.C. § 7434(a).  Courts in this Circuit have had little occasion to interpret the statute, so the Court looks to opinions from other Circuits as persuasive authority.

As to Defendants' first argument, the Second Circuit has held that the text of the statute "plainly does not encompass an alleged *failure* to file a required information return."  *Katzman v. Essex Waterfront Owners LLC*, 660 F.3d 565, 568 (2d Cir. 2011) (per curiam).  Congress's use of the term "willfully files" plainly excludes liability for one who files nothing.  *Id.*  The Second Circuit also pointed out that there are other provisions of the Internal Revenue Code that punish a failure to file a required return, but those sections do not create a private right of action.  *Id.* at 569.  Tellingly, Plaintiffs cite to no contrary cases to support their argument.  *See* Opp'n at 17. The Court agrees with the Second Circuit's analysis.

As to the second argument, courts are split on whether intentionally filing the wrong *form* that includes the right *amount* can constitute a violation of the statute. *Compare Liverett v. Torres Advanced Enter. Sols. LLC*, 192 F. Supp. 3d 648, 653 (E.D. Va. 2016) (Ellis, J.) (holding that both the text and structure of the statute preclude liability for misclassification) *with Leon v. Tapas & Tintos, Inc.*, 51 F. Supp. 3d 1290, 1298 (S.D. Fla. 2014) (finding, without explanation, that willful misclassification violates the statute). Judge Ellis's exhaustive textual analysis of the ambiguities in the statute has become the dominant view since he issued his ruling in *Liverett*; indeed, the Court cannot find a single post-*Liverett* decision that went the other way on a similar set of facts. *See Evans v. United Parcel Service, Inc.*, No. 19 CV 4818, 2020 WL 777253, at *3 (N.D. Ill. Feb. 18, 2020) (collecting cases); *cf. Greenwald v. Regency Mgmt. Servs., LLC*, 372 F. Supp. 3d 266, 270–71 (D. Md. 2019) (distinguishing *Liverett* on the facts of the case). The Court agrees with Judge Ellis's authoritative opinion: Plaintiffs cannot state a claim against Defendants under § 7434 merely for mischaracterizing them as independent contractors rather than employees or owners and thereby filing the wrong tax form.

But the Complaint goes farther, alleging that "the Form 1099s did not accurately report all income or losses related to Plaintiffs' ownership interests in EIC." 3d Am. Compl. ¶ 91. This allegation may be enough to distinguish *Liverett*. In *Greenwald*, Judge Russell declined to follow *Liverett* because the Plaintiffs "d[id] not allege that Defendants misclassified them as independent contractors" but rather claimed, among other allegations, "that Defendants willfully underreported the amounts [they were actually paid] on their W-2s, 1099s, or both in an effort [to] defraud tax authorities by reducing their tax obligations." 372 F. Supp. 3d at 270–71. Judge Russell concluded that such conduct fell within the statute's ambit. *Id. See also Czerw v. Lafayette Storage & Moving Corp.*, No. 16-CV-6701-FPG, 2018 WL 5859525, at *3 & n.2

(W.D.N.Y. Nov. 9, 2018) ("[B]ecause Plaintiff alleges that the Form 1099-MISC incorrectly states the amount paid to him, . . . the Court need not address whether the alleged misclassification supports a claim under § 7434.); *Chin Hui Hood v. JeJe Enters., Inc.*, 207 F. Supp. 3d 1363, 1379 (N.D. Ga. 2016) ("[The distinction] matters not in this action, because Plaintiff provides evidence of both [misclassification and underreporting].").

Those situations, however, do not quite match the allegations here.  Plaintiffs do not deny that the 2017 Form 1099s accurately reflect the cash payments EIC made to them during that tax year.  Instead, they claim that those cash payments do not reflect a complete accounting for their income and losses as *owners*.  This case seems to pose a slightly different question than those listed above, which courts do not seem to have faced before:  does § 7434 govern a situation in which a company allegedly mischaracterizes a plaintiff as an independent contractor and files a Form 1099 that accurately reports cash payments made to the plaintiff when the plaintiff alleges that he is neither a contractor nor an employee but rather an owner, entitled to claim the company's own gains and losses as his own for the purposes of documenting his income?

That seems to be a question of first impression among the courts that have addressed the statute's application.  "Congress's goal in enacting § 7434 was to give redress to taxpayers aggrieved by the filing of information returns that fraudulently misrepresent the amount paid to the taxpayer." *Liverett*, 192 F. Supp. 3d at 655.  Although this case involves a 1099 that correctly stated the amount of *cash* EIC distributed to Plaintiffs, Plaintiffs allege that EIC was required to file other forms documenting both cash distributed *and* the corporation's gains and losses, which, because EIC is an S Corporation under the Tax Code, pass through the corporation and affect shareholders' tax liabilities.  *See* 3d Am. Compl. ¶¶ 8, 45; *see also* 26 U.S.C. § 1366. That is, EIC allegedly properly reported the amounts it distributed to Butler and Price, but it

willfully neglected to report the amount of corporate gains and losses that should have passed through the corporation to Butler and Price as shareholders, pro-rated according to their interests in the firm.  Those allegations come within the terms of the statute, which creates liability for anyone who "willfully files a fraudulent information return with respect to *payments* purported to be made to" Plaintiffs.  26 U.S.C. § 7434(a) (emphasis added).

Such an allegation makes this situation closer to the circumstances of *Greenwald* and distinguishes it from the rule in *Liverett*.  In *Greenwald*, "Plaintiffs . . . allege[d] that the amounts Defendants reported were incorrect—and that this misreporting was willful."  372 F. Supp. 3d at 271.  From the face of the Complaint, it's unclear exactly what benefits Defendants stood to gain from the alleged misreporting or what damages Plaintiffs could have possibly suffered—those questions and others may pose stumbling blocks to Plaintiffs.  It is also not clear that Plaintiffs will be able to prove that EIC acted willfully rather than negligently.  But Plaintiffs have at least "nudged their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.

Finally, Defendants briefly argue that the Complaint fails to meet the heightened pleading standard of Federal Rule of Civil Procedure 9(b).  *See* Reply at 8–9.  As mentioned above, "Rule 9(b) requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud."  *Anderson*, 221 F.R.D. at 253 (quoting *DiLeo,* 901 F.2d at 627).  The Complaint meets that threshold.  It alleges that Augustine and EIC willfully classified Butler and Price as independent contractors rather than shareholders when they filed EIC's 2017 tax returns with the IRS by filing Form 1099s instead of a Form 1120 Schedule K or other document that was required to record Butler's and Price's shares of the corporation's gains and losses for that tax year.  *See* 3d Am. Compl. ¶¶ 42–49, 88–96.  These allegations suffice under Rule 9(b).

The Court therefore partially dismisses Count V as it applies to Defendants' alleged failure to file tax returns in 2014, 2015, and 2016.  It leaves the rest of Count V in place.

### 3. Specific Remedy Counts

Beyond the seven counts alleging substantive legal claims, the Complaint contains two counts requesting that the Court grant specific remedies to assist Plaintiffs in their quest to gain ownership of EIC.  Count VIII seeks "an order declaring that Butler and Price are shareholders of EIC, in accordance with the oral transfer of company ownership made to Butler and Price by Augustine, as well as the amount and value of those shares" under the Declaratory Judgment Act, 28 U.S.C. § 2201, and Federal Rule of Civil Procedure 57.  3d Am. Compl. ¶¶ 112–13. Count IX in turn seeks a Court-ordered accounting of EIC's financial records so that Plaintiffs can determine how much of EIC they own and what their stakes are worth.  *Id.* ¶¶ 114–16.

#### a. *Declaratory Relief*

Defendants argue that a separate count seeking declaratory relief is duplicative of the other counts because it would declare relief already "subsumed in [the] other claims." *Rodriguez v. Lab. Corp. of Am. Holdings*, 13 F. Supp. 3d 121, 128 (D.D.C. 2014).  Under the Declaratory Judgment Act, the Court may resolve "a case of actual controversy within its jurisdiction" by "declar[ing] the rights and other legal relations of any interested party seeking [a] declaration, whether or not further relief is or could be sought."  28 U.S.C. § 2201(a).  After ensuring that the claim states an actual case or controversy, *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007), the Court "must still consider whether it is appropriate to exercise its discretion to grant declaratory relief."  *Gibson v. Liberty Mut. Grp., Inc.*, 778 F. Supp. 2d 75, 78 (D.D.C. 2011).

"In the D.C. Circuit, two criteria are ordinarily relied upon: 1) whether the judgment will serve a useful purpose in clarifying the legal relations at issue, or 2) whether the judgment will

terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Glenn v. Fay*, 222 F. Supp. 3d 31, 36 (D.D.C. 2016) (citing *President v. Vance*, 627 F.2d 353, 364 n.76 (D.C. Cir. 1980)). "Ultimately, the purpose of the Declaratory Judgment Act is to 'allow the uncertain party to gain relief from the insecurity caused by a potential suit waiting in the wings.'" *Id.* (quoting *The Hipage Co., Inc. v. Access2Go, Inc.*, 589 F. Supp. 2d 602, 615 (E.D. Va. 2008) (quoting *United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 494 (4th Cir. 1998))).

Regardless of whether the case satisfies the first criterion, it certainly does not satisfy the second one. Unlike in *Gibson*, Count VIII does not pose distinct legal or factual questions but merely incorporates the questions already raised in Count I. In *Gibson*, there was "no dispute over the existence of [an insurance] policy or the nature of the parties' legal relationships;" the only questions were "purely factual ones regarding proper compliance with the policy." 778 F. Supp. 2d at 79. Those were not legal questions appropriate for a declaratory judgment but rather "purely factual ones . . . best reserved for the finder of fact." *Id.* Here, in contrast, the Parties dispute the existence of the contract and the legal nature of their relationship. *See supra* Section III.A.1.

It's conceivable that a declaration, on its own, would serve to clarify the nature of the relationship and the resulting duties of the Parties. But judgment on the substantive counts would defeat the need for a declaration. As in *Gibson*, "[i]f Plaintiffs succeed in proving that Defendants [breached the contract], then Plaintiffs will prevail under [the separate breach-of-contract count]." 778 F. Supp. 2d at 80. The counts for declaratory relief, therefore, would "add nothing to [Plaintiffs'] suit." *Id.* The Court dismissed those counts and permitted the breach-of-contract count to move forward. *Id.* This case is no different. Judgment on Count I (breach of

contract) will clarify the nature of the Parties' relationship and permit them (and the Court) to determine who owns what percentage of EIC.  Declaratory relief would serve no additional purpose, so the Court dismisses Count VIII.

> b.   *Accounting*

The Complaint's final count requests that the Court order an accounting "of corporate assets and financial records" to permit "Plaintiffs, as owners of EIC, to know the percentage of their ownership interest and the value thereof."  3d Am. Compl. ¶¶ 114–16.  Defendants argue that equitable requests for an accounting cannot be stand-alone claims; if anything, accounting is merely one available form of relief at the *end* of litigation once the Court has determined liability on the contract claims.  *See* Mot. at 17.

"An accounting is 'a detailed statement of the debits and credits between parties arising out of a contract or fiduciary relation.'"  *Bates v. Nw. Human Servs., Inc.*, 466 F. Supp. 2d 69, 103 (D.D.C. 2006) (quoting *Union Nat'l Life Ins. Co. v. Crosby*, 870 So. 2d 1175, 1178 n.2 (Miss. 2004)).  A request for an accounting is "not, strictly speaking, . . . a stand-alone claim at all."  *Haynes v. Navy Fed. Credit Union*, 52 F. Supp. 3d 1, 10 (D.D.C. 2014) (internal quotation omitted).  But it is not unusual to leave such counts in place at the Motion-to-Dismiss stage and then to resolve them only at summary judgment or later, depending on whether Plaintiffs can establish both liability on the breach of contract *and* insufficiency of legal damages.  *See Bates*, 466 F. Supp. 2d at 104 (denying motion to dismiss accounting count); *Armenian Assembly of Am., Inc. v. Cafesjian*, 692 F. Supp. 2d 20, 48 (D.D.C. 2010) (denying summary judgment on accounting claim after denying judgment on contract claim); *Haynes*, 52 F. Supp. 3d at 10 (granting summary judgment for Defendant on accounting claim, along with judgment on

breach-of-contract claim, because accounting "is a remedy premised on a breach of fiduciary duty or contract that Plaintiff does not establish").

At this time, it is unclear whether an accounting might be necessary to determine who owns what percentages of EIC.  It may be the case that Plaintiffs will not be able to establish liability, obviating the need for an accounting.  But if Plaintiffs are successful on their other claims, a court-ordered accounting may be the only way to determine the company's ownership.  That is especially appropriate because Plaintiffs have alleged that Augustine hid the company's books from them to keep them in the dark about both general financial status and their own equity.  3d Am. Compl. ¶¶ 9, 27–28; *see also Cafesjian*, 692 F. Supp. 2d at 48 (involving dispute over access to corporate records); *Bates*, 466 F. Supp. 2d at 103 (citing *P.V. Props., Inc. v. Rock Creek Vill. Assocs.*, 549 A.2d 403, 409 (Md. Ct. Spec. App. 1988) ("An accounting may be had where one party is under an obligation to pay money to another based upon facts and records which are known and kept exclusively by the party to whom the obligation is owed.")).

## B.      Motion to Disqualify Defense Counsel

Some months after Defendants moved to dismiss the operative Complaint, Plaintiffs responded with a Motion to Disqualify Defendants' Counsel, William Cusmano.  *See generally* DQ Mot.  They argue that Cusmano's continued representation in this matter violates D.C. Rules of Professional Conduct 1.7, 1.9, 1.13, 1.18, and 3.7.  *Id.* at 1–2.  Plaintiffs contend that those alleged violations, taken together, establish three reasons for disqualifying Cusmano:  (1) Cusmano represented Butler in his individual capacity in the early stages of this ownership dispute, so that he cannot now represent Augustine on the other side of the same controversy, *see id.* at 13–17; (2) Cusmano allegedly represented the three purported owners together as a group (in his capacity as EIC's outside counsel) and therefore is barred from representing the company against two of its alleged shareholders, *see id.* at 11–13; and (3) Plaintiffs intend to subject

Cusmano himself to discovery, including a deposition, and they contemplate calling him as a fact witness at trial, so he cannot represent a party in the same litigation. *See id.* at 17–20.

### 1. Plaintiffs Have Not Demonstrated that Cusmano was Butler's Attorney

According to Plaintiffs, EIC had three owners in 2017: Augustine, Butler, and Price. *See* Butler Decl. ¶ 7.[6] It is undisputed that Butler was the first of the three to reach out to Cusmano regarding the brewing dispute over Butler and Price's role within the company. *Id.* ¶¶ 7–9; William Cusmano Decl. ¶¶ 6, 8–9, ECF No. 40-2. Butler states that before Cusmano brought in Price and Augustine for further discussions, Butler and Cusmano had private conversations in which Butler laid out his position on the matter and sought Cusmano's legal advice. Butler Decl. ¶¶ 10–15. According to Butler, Cusmano heard him out and expressed surprise that there was any uncertainty regarding Butler and Price's partial ownership of EIC. *Id.* ¶ 10. Cusmano recommended that Butler raise the matter with Augustine and, in the event the Parties could not reach a solution, that Butler and Price pursue legal remedies. *Id.* ¶ 11. Butler insists that he shared confidential information about his position with Cusmano. *Id.* ¶ 15.[7]

For his part, Cusmano admits to speaking individually with Butler generally but denies that he ever received confidential information or gave legal advice to Butler as an individual.

---

[6] The Parties attached several exhibits to their briefs on the Motion to Disqualify, including declarations and records of correspondence between Cusmano and the Parties dating to 2017. The Court did not consider those materials in its decision on the Motion to Dismiss so as to avoid converting the Motion into a Motion for Summary Judgment. *See* Fed. R. Civ. P. 12(d).

[7] At the hearing on the Motion, Plaintiffs indicated that the confidential information included discussions on the possibility of merging EIC with other companies Butler and Price controlled. The Parties have relied on emails between and among the Parties discussing those companies and their interactions with EIC, so it is unclear to the Court whether that information (or any other information from those allegedly privileged conversations) ever was or would still be subject to attorney-client privilege if Cusmano and Butler had indeed created an attorney-client relationship.

Cusmano Decl. ¶¶ 4–5.  In Cusmano's view, he was consulting with an employee of a company

that regularly engaged his services, and he believed that he was acting as EIC's counsel, not as

Butler's personal attorney.  *Id.*

Shortly thereafter, Cusmano began to facilitate discussions among the three purported

partners to find a solution.  Butler Decl. ¶¶ 17–18.  The four traded a series of emails in which

Cusmano attempted to find vehicles for structuring a transfer of shares from Augustine to Butler

and Price in exchange for cash payments, but the Parties failed to reach an agreement and

negotiations broke down.  *See generally* Email Correspondence, ECF Nos. 39-4, 39-5.  Cusmano

then dropped out of the matter for two years, reappearing after the District Court in Louisiana

transferred the matter to this Court, when EIC and Augustine engaged Cusmano to represent

them in litigation.  *See, e.g.*, Def. EIC Corp.'s Answer to Pls.' 3d Am. Compl., ECF No. 22 (filed

by William Cusmano).

Lawyers who practice before this Court must comply with the District of Columbia Rules

of Professional Conduct.  *See* LCvR 83.15(a).  Rule 1.9 provides that

> A lawyer who has formerly represented a client in a matter shall not
> thereafter represent another person in the same or a substantially
> related matter in which that person's interests are materially adverse
> to the interests of the former client unless the former client gives
> informed consent.

In Plaintiffs' eyes, Cusmano formerly represented Butler in his individual capacity in preparation

for negotiations with Augustine over EIC's ownership—the same question underlying this suit—

and Cusmano is now in a position to take advantage of confidential information Butler conveyed

to him for Defendants' benefit.  *See* DQ Mot. at 13–14.  Defendants (and Cusmano) argue that

Cusmano was EIC's counsel throughout the events in question and that he made that fact clear to

everyone involved in the matter, so he cannot now be precluded from continuing his

representation of EIC in the same matter.  *See* Defs.' Mem. in Opp'n to Pls.' Mot. to Disqualify

Counsel ("DQ Opp'n") at 10–20, ECF No. 40-1.

Plaintiffs bear the burden of establishing the existence of a prior attorney-client

relationship and that "the current litigation is substantially related to the prior representation."

*Derrickson*, 541 A.2d at 151–52; *see also* D.C. R. Prof'l Conduct 1.9, cmt. 2 (incorporating

"substantial relationship" test expressed in *Brown v. D.C. Bd. of Zoning Adjustment*, 486 A.2d 37

(D.C. 1984) (en banc)).  In particular, Plaintiffs must demonstrate that Butler and Cusmano,

"explicitly or by their conduct, manifest[ed] an intention to create the attorney[-]client

relationship."  *In re Ryan*, 670 A.2d 375, 379 (D.C. 1996) (quoting *Nolan v. Foreman*, 665 F.2d

738, 739 n.3 (5th Cir. 1982)).  Courts consider various factors in evaluating this question,

including "whether the client perceived that an attorney-client relationship existed, whether the

client sought professional advice or assistance from the attorney, whether the attorney took

action on behalf of the client, and whether the attorney represented the client in proceedings or

otherwise held h[im]self out as the client's attorney."  *Teltschik*, 683 F. Supp. 2d at 45.

"[N]either a formal agreement nor the payment of fees is necessary to create a[] . . .

relationship," but the presence of either factor is indicative.  *Derrickson*, 541 A.2d at 153.

Here, Butler avers that he sought professional advice from Cusmano, who brought his

concerns to Augustine and advocated on his behalf.  *See* Butler Decl. ¶¶ 12–14.  It is undisputed

that Butler did not pay Cusmano and that there was no formal representation agreement.  *Id.*

¶ 17; DQ Opp'n at 20.  It is conceivable that Butler may have subjectively understood himself to

be engaging Cusmano as his personal attorney for some short period of time, though even he

acknowledges that only a few days later Cusmano "transitioned to representing EIC" when

Cusmano began brokering a deal between all Parties.  Butler Decl. ¶ 17.

But "the attorney-client relationship does not rest on the client's view of the matter; rather, [the Court] consider[s] the totality of the circumstances to determine whether an attorney-client relationship exist[ed]." *In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (citing *In re Lieber*, 442 A.2d 153, 156 (D.C. 1982)).  Cusmano's conduct upon being engaged by Butler (as Butler himself describes it), while somewhat consistent with the existence of an individual attorney-client relationship, is equally consistent with Cusmano's role as *EIC's* counsel.  Butler admits that it was he who first hired Cusmano as EIC's outside counsel in 2014 and who directed the course of Cusmano's corporate representation.  Butler Decl. ¶¶ 2–5.  Augustine, in turn, was responsible for handling payments.  *Id.* ¶ 6.  The same course of events occurred two other times following Cusmano's 2014 representation and before Butler contacted Cusmano (for the fourth time) in 2017 about this matter.  *Id.* ¶¶ 4.

Contemporaneous documentary evidence confirms Defendants' version of the events.  Butler avers that he initiated discussions on the issue with Cusmano in September 2017, just as he had in earlier instances when EIC retained Cusmano's legal services.  *Id.* ¶ 7.  The first document related to this event is an email dated September 6, 2017, in which Cusmano related that he had had private conversations with both Butler *and* Augustine to feel out their respective positions and proposed "various scenarios for [Butler] buying out [Augustine's] ownership interest in EIC."  William Cusmano's Email of Sep. 6, 2017, ECF No. 39-4 at 2.  Tellingly, in concluding that short message, Cusmano indicated that "[Augustine] just called and said that he wanted to talk more to [Butler] before these plans proceed, and *he instructed me to stand down for now*."  *Id.* (emphasis added).  This phrasing indicates that it was Augustine, not Butler, who was directing Cusmano's activities—behavior that is entirely inconsistent with the notion of Cusmano acting as *Butler's* attorney.

This correspondence continued for another several days until negotiations broke off on September 15.  *See generally* Email Correspondence, ECF No. 39-5.  There is no indication in any of these documents that Cusmano represented Butler *against* Augustine; his position at the time appears to have been that of a neutral broker trying to arrange a transaction that would benefit all involved players.  *Id.*  And when Cusmano wrote up a short summary of the Parties' positions and scenarios that might accomplish the Parties' goals, attaching the document to an email sent on September 11, 2017, he included the following disclosure at the outset:

> *As an introductory reminder, Cusmano is the lawyer for the company.*  Assuming that one goal of the transaction is to leave EIC intact, Cusmano likely can represent the company and paper the deal. The individual principals should consider their own counsel and particularly [Augustine], since his status will change more than anyone's.  Separate counsel for [Butler] or [Price] probably is less of an issue, since they will be principals of the surviving entity, but no one involved is discouraged from obtaining his own counsel.

William Cusmano's Ltr. of Sep. 13, 2019 at 4–5, ECF No. 40-3 (emphasis added) (providing original attachment to Plaintiffs' counsel); *see also* William Cusmano's Email of Sep. 11, 2017, ECF No. 39-5 at 7 (attaching talking points and describing attachment).  This information, given to Butler no more than ten days after he purported to establish an attorney-client relationship with Cusmano, should have removed any confusion over Cusmano's role.

While Butler insists that Cusmano represented both Butler as an individual and the company at different points in time, he has provided no evidence of such a relationship beyond his own subjective impression, which is insufficient to establish the relationship's existence—at least not enough to support the extraordinary remedy of disqualification.  *See Headfirst Baseball, LLC v. Elwood*, 999 F. Supp. 2d 199, 210 (D.D.C. 2013) ("[The Parties'] declarations and their content that support the existence of the relationship provide far less than what other courts have accepted as evidence establishing an attorney-client relationship.").

Finally, Plaintiffs briefly argue that even if Butler and Cusmano did not form a privileged relationship, Rule 1.18 covers situations in which "a lawyer . . . has had discussions with a prospective client" and has "received a confidence or secret from the prospective client." D.C. R. Prof'l Conduct 1.18(b), (c). The Rule forbids the lawyer from "represent[ing] a client with interests materially adverse to those of [the] prospective client in the same or a substantially related matter." *Id.* 1.18(c). Plaintiffs liken Butler and Cusmano's initial discussions to those of a prospective client seeking out an attorney, even if the relationship did not later arise. *See* DQ Mot. at 15–16. But that argument assumes that Butler was a potential client rather than an existing client *in his capacity as an EIC employee (or owner)*. The totality of the circumstances, as discussed above, indicates that Cusmano was the corporation's lawyer, and that his interactions with Butler occurred in the course of that representation. Rule 1.18 therefore does not apply to the situation.

It is sometimes true that "in the absence of warning from the lawyer, a constituent of an organizational client may reasonably rely on the lawyer's apparent willingness to provide legal services for the constituent in addition to the entity, thus creating an implied client-lawyer relationship." Restatement (Third) of the Law Governing Lawyers § 14, cmt. f (Am. Law. Inst. 2000). But the overwhelming evidence in the record shows that Cusmano repeatedly gave such warnings and that, within a few days of initial discussions, Cusmano and Butler included Price and Augustine on the conversation and shared with them the same information that they had previously discussed between themselves. *See* Cusmano Decl. ¶ 12; Cusmano's Email of Sep. 6, 2019. There is no indication that Cusmano learned any private information that remained private for more than a few days and that would be useful to Defendants in this litigation.

The totality of the circumstances, based on the evidence the Parties submitted, does not demonstrate the existence of an attorney-client relationship between Butler and Cusmano at any time leading up to the genesis of this dispute, or any type of relationship approximating an attorney-client relationship.  The Court therefore cannot disqualify Cusmano on those grounds. Because it finds that no relationship existed, there is no need to reach the questions of whether the matters are substantially related or whether the Parties' positions are materially adverse.

### 2. The Court Cannot Determine Whether Cusmano Currently Represents Adverse Parties

Plaintiffs next argue that Cusmano cannot now represent EIC against Butler and Price because Butler and Price were and still are themselves partial owners of EIC.  *See* DQ Mot. at 11–13.  In other words, having advised all of EIC's owners at an earlier period in this dispute, Cusmano "may not pick sides" now and represent the corporation and one of its owners against the other two.  *Id* at 12–13 (citing *Griva v. Davidson*, 637 A.2d 830, 844 (D.C. 1994)).

Rule 1.7 provides that

> (a)  A lawyer shall not advance two or more adverse positions in the same matter.
>
> (b)  Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:
>
>   (1)  That matter involves a specific party or parties and a position to be taken by that client in that matter is adverse to a position taken or to be taken by another client in the same matter . . . ;
>
> . . .
>
> (c)  A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if
>
>   (1)  Each potentially affected client provides informed consent to such representation after full disclosure of the existence and nature of the possible conflict and the possible adverse consequences of such representation; and

> (2)  The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client.

D.C. R. Prof'l Conduct 1.7.  There is no question that Plaintiffs do not consent to any dual representation, so the Court must determine whether Cusmano is currently engaged in representing one set of his clients against another set.  Rule 1.13 lays out further guidance in the context of organizational relationships:

> A lawyer representing an organization may also represent any of its directors, officers, employees, members, shareholders, or other constituents, subject to the provisions of Rule 1.7.  If the organization's consent to the dual representation is required by Rule 1.7, the consent shall be given by an appropriate official of the organization other than the individual who is to be represented, or by the shareholders.

*Id.* 1.13(d).  Together with Rule 1.7, Rule 1.13 "mandates an absolute prohibition of dual or multiple representation when the lawyer would represent [shareholders] with adverse positions [to the organization] in the same matter."  *Griva*, 637 A.2d at 843 (internal quotations omitted).

At this issue has arisen with some frequency in the case law.  In *Griva*, the court had to determine, "when a law firm that represents a three-member partnership also represents two of the individual partners in matters that pertain to the partnership, [whether] the third partner [may] obtain . . . disqualification of the law firm from representing the partnership?"  *Id.* at 832.  A law firm assisted three siblings in forming a family partnership to manage their father's interest in an apartment building.  *Id.* at 833.  The same firm also assisted the three in guardianship and estate planning services for the elderly father.  *Id.*  After forming the partnership, the firm represented the new entity in its business dealings *and* expressly represented two of the three siblings in their interests in the partnership, as well as in unrelated personal matters.  *Id.*  The third sibling obtained separate counsel to represent her own interests in the partnership.  *Id.* at 833–34.  Management disputes arose, and Griva (the third sibling) determined that the partnership's

49

counsel was stacking the deck against her in partnership affairs, withholding documents, and planning to dissolve the partnership to permit the other siblings to control the business.  *Id.* at 834.  She sued both her siblings, their lawyers, and the partnership, trying to disqualify the firm from representing the partnership and trying to get access to the firm's documents so that she could see what the partnership was doing.  *Id.* at 834–35.

The Court of Appeals found that it could not determine whether the Partnership's attorneys had violated any rules of professional conduct because of genuine issues of material fact.  *Id.* at 844.  The case involved a partnership agreement that included a "unanimous consent" clause, such that the partnership could not consent to dual representation of both the partnership and the two siblings without the third sibling's affirmative vote.  *Id.* at 840.  There were fact issues about whether and to what arrangement she had consented, so the Court of Appeals could not answer the question without a trial.  *Id.* at 845–46.

*Headfirst Baseball*, a dispute involving two officials of a limited liability company that ran youth baseball camps, bears an even stronger resemblance to this case.  999 F. Supp. 2d at 203.  When the officials founded the company, they relied on one founder's father, a lawyer at Williams & Connolly, and other attorneys from the firm to handle the formation.  *Id.* at 204.  The firm's attorneys then acted as the company's outside counsel, allegedly providing both corporate and personal legal advice to both founders.  *Id.*  But when a dispute later arose between the founders, Williams & Connolly represented both the company and its partner's son in that suit against the other founder, Elwood (though the father and another attorney involved in the company's formation did not participate personally).  *Id.* at 204.  Elwood moved to disqualify the firm, arguing in part that it had once advised both partners along with the company, so it could not then represent the company and one partner against the other.  *Id.*

Factual uncertainties precluded a concrete finding that warranted disqualification.  *Id.* at

208.  First, because there was no documentary evidence showing that Elwood was a member of

the party LLC, he claimed (without evidence) that he was instead a partner in the "Headfirst

Partnership," an unincorporated but related entity that the other official denied existed.  *Id.* at

207.  Second, there was no correspondence in the record showing any communications between

Williams & Connolly lawyers and Elwood until after the purported representation—the first

relevant documents were declarations by the Parties prepared for litigation.  *Id.* at 210.  For those

two reasons, the Court concluded that Elwood could not prove the existence of an attorney-client

relationship between Williams & Connolly and him, so the Court could not disqualify the

attorneys for violating it.  *Id.* at 208.  The Court denied the motion without prejudice, allowing

for the fact that the record at summary judgment might change the analysis.  *Id.*

Taken together, *Griva* and *Headfirst* suggest that, in order for the Court to determine

whether Cusmano is violating Rules 1.7 and 1.13 by representing EIC and Augustine in this

litigation, the Court would first need to determine whether Butler and Price were or still are

owners and officers of EIC.  But to do that, the Court would need to decide the fundamental

issues in the case:  whether there was a contract, whether Augustine breached the contract, and

whether Butler and Price are entitled to some share of EIC.  Of course, that's impossible at the

Motion-to-Dismiss stage.  By the time the Court knows the answers to those questions, the case

will be over and it will be irrelevant whether Cusmano may be permitted to represent

Defendants.

"The scant nature of the existing factual record does not square with the high burden

[Plaintiffs] must satisfy to disqualify [Defendants'] counsel of choice.  While discovery and

further development of the facts in this case might ultimately support a finding of a Rule

1.7 violation, [Plaintiffs] may not rely on that Rule as a basis for disqualifying [Cusmano] as

[Defendants'] counsel in this case at this time.  The Court must therefore deny [Plaintiffs'] Rule

1.7 challenge without prejudice.  If evidence later comes to light that would counsel in favor of

disqualification, [Plaintiffs] may re-file their motion." *Headfirst*, 999 F. Supp. 2d. at 208.

> ### 3.  The Court Cannot Determine Whether Cusmano Will Be a Necessary Trial Witness

Finally, Plaintiffs contend that Cusmano cannot serve as litigation counsel because he is a

witness to events at the heart of the dispute and will undoubtably be called to testify about what

he saw and heard.  *See* DQ Mot. at 17–20.  Rule 3.7 provides:

> (a)  A lawyer shall not act as advocate at a trial in which the lawyer
> is likely to be a necessary witness except where:
>
> (1)  The testimony relates to an uncontested issue;
>
> (2)  The testimony relates to the nature and value of legal services
> rendered in the case; or
>
> (3) Disqualification of the lawyer would work substantial hardship
> on the client.

D.C. R. Prof'l Conduct 3.7(a).  At this point in the case, two portions of the rule counsel against

disqualification on this basis.  First, the rule precludes an attorney from "advocat[ing] at a trial."

*Id.*  This case is nowhere near trial; on its face, the rule does not prohibit Cusmano from

representing Defendants in the pre-trial stages of litigation.  Second, the rule bars attorneys

whose testimony at trial is "necessary."  *Id.*  At this early stage, no one knows whether

Cusmano's testimony will be "necessary" to the conduct of a trial (or whether a trial will ever

occur).  Plaintiffs raise several valid reasons for why they intend to call Cusmano as a trial

witness, but the Court cannot know how those rationales may shift between now and then.

Finally, the rule provides an exception where "[d]isqualification of the lawyer would

work substantial hardship on the client."  *Id.*  Given that the rule does not *require* disqualification

at this time, the Court concludes that disqualification would do just that to Defendants.  At a hearing, the Court informed Augustine himself that Cusmano's potential necessity at trial is foreseeable and that he should be prepared to find another trial lawyer if that scenario comes to pass.  Moreover, the Court will likely permit Plaintiffs to depose Cusmano in the normal course of discovery.  But the Court will not disqualify Cusmano—yet.

### IV.    Conclusion

The Third Amended Complaint timely and adequately alleges that a contract existed and that Defendants breached it, or in the alternative, that Augustine made some promise and that Plaintiffs relied on it to their detriment.  An accounting may be necessary to figure out who owns what.  The Complaint also adequately alleges invasion of privacy for appropriation of likeness and fraudulent filing of tax returns, at least in part.  But it does not state a claim for fraudulent inducement or a violation of the Stored Wire and Communications Act, and there is no need for a declaratory judgment.  Finally, the established facts do not warrant defense counsel's disqualification at this stage.  Accordingly, it is

**ORDERED** that Defendants' Motion to Dismiss the Third Amended Complaint is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that Plaintiffs' Motion to Disqualify Defendants' Counsel is **DENIED** without prejudice.

An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  May 6, 2020

CARL J. NICHOLS
United States District Judge